UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.Y. and D.Y., as Parents and Natural Guardians of B.Y., | : | **CIVIL NO. 1:07-CV-1184** |
| | : | |
| | : | (Magistrate Judge Smyser) |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| CUMBERLAND VALLEY SCHOOL DISTRICT, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM AND ORDER

I. Background and Procedural History.

On June 29, 2007, the plaintiffs commenced this action under the Individuals with Disabilities Education Act, 29 U.S.C. § 1400, *et seq*, by filing a complaint.  On July 20, 2007, the defendants filed an answer to the complaint.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and, on August 22, 2007, the case was reassigned to the undersigned.

On April 17, 2008, the plaintiffs filed a Motion for Summary Judgment/Judgment on the Administrative Record Together with Limited New Evidence, a statement of undisputed facts and a brief in support of their motion.

Also on April 17, 2008, the defendant filed a Motion for
Summary Judgment and Judgment on the Administrative
Record, a statement of uncontested facts and a brief in
support of its motion.

On May 5, 2008, the defendant filed a brief in
opposition to the plaintiffs' motion and a response to
the plaintiffs' statement of undisputed facts.

On April 25, 2008, the plaintiffs filed a brief in
opposition to the defendant's motion.  The plaintiffs,
however, did not file a response to the defendant's
statement of uncontested facts as required by Local Rule
56.1.  On May 8, 2008, the defendant filed a reply brief
in which it argued that pursuant to Local Rule 56.1 the
facts set forth in its statement of uncontested facts
should be deemed admitted.

On May 14, 2008, the plaintiffs filed a motion to
dismiss the defendant's request to deem admitted as true
the defendant's statement of uncontested facts.  By an
order dated May 21, 2008, we denied the plaintiff's
motion to dismiss the defendant's request to deem
admitted as true the defendant's statement of uncontested
facts and we ordered the plaintiffs to file, within ten
days, a response in accordance with Local Rule 56.1 to
the defendants' statement of uncontested facts.  The
Order of May 21, 2008 also provided that the defendant

2

may file a supplemental reply brief in support of its motion within ten days after the date the plaintiffs file their response to the defendant's statement of uncontested facts.

On May 29, 2008, the plaintiffs filed a response to the defendant's statement of uncontested facts.

II.  Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, though the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party."  *Natale v. Camden County Correctional*

3

*Facility*, 318 F.3d 575, 580 (3d Cir. 2003).  In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  "Our function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).

III.  IDEA Standards.

Congress enacted the IDEA *inter alia* "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A).  The Act defines free appropriate public education (FAPE) as:

> special education and related services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 614(d) [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(8).  "The Supreme Court has construed the statute's FAPE mandate to require 'education specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction.'" *T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)(quoting *Bd. of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982)).  Although the state is not required to maximize the potential of a handicapped child, the education provided must be sufficient to confer some educational benefit upon the handicapped child. *Id.*

In addition to the FAPE requirement, the IDEA provides that states must establish procedures that assure that to the maximum extent appropriate children with disabilities are educated with children who are not disabled. 20 U.S.C. § 1412(a)(5).

An Individualized Education Program (IEP) is the primary vehicle for providing students with the required FAPE. *S.H. v. State-Operated School of Dist. of the City of Newark*, 336 F.3d 260, 264 (3d Cir. 2003).  "The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." *Polk v. Central Susquehanna Intermediate Unit 16*, 853

5

F.2d 171, 173 (3d Cir. 1988).  The IEP must include a
number of elements:

> It must include a statement of the child's
> current level of performance, and how her
> disability affects her performance.  *Id.* at
> (d)(1)(A)(i)(I).  It must set measurable annual
> goals relating both to progress in the general
> curriculum and additional educational needs
> arising from her disability.  *Id.* at
> (d)(1)(A)(ii).  The IEP must detail those
> special education services and supplementary
> aids that the school will provide, explain how
> they will contribute toward meeting the annual
> goals, how they will allow the child to progress
> in both the general curriculum and participate
> in extracurricular activities, and describe how
> the child will interact with disabled and
> nondisabled children.  *Id.* at (d)(1)(A)(iii).
> In measuring the child's progress, the IEP must
> explain whether standard student assessments
> will be used.  If not, the IEP must explain why
> not and how the school will assess the child.
> *Id.* at (d)(1)(A)(v).

*S.H., supra,* 336 F.3d at 264.

An IEP must offer more than a trivial or de minimis
educational benefit. *Kingwood Twp., supra,* 205 F.3d at
577.  "[A] satisfactory IEP must provide 'significant
learning' and confer 'meaningful benefit.'" *Id.* (quoting
*Polk, supra,* 853 F.2d at 182, 184).  The educational
benefit of the IEP must be gauged in relation to the
child's potential. *Ridgewood Bd. of Educ. v. N.E.,* 172
F.3d 238, 247 (3d Cir. 1999).  "To fulfill this mandate a
district court must 'analyze the type and amount of
learning' of which the student is capable." *Kingwood
Twp., supra,* 205 F.3d at 578.  "The issue of whether an
IEP is appropriate is a question of fact." *S.H., supra,*
336 F.3d at 271.

6

The Act imposes numerous procedural safeguards to ensure proper development of the IEP and to protect the rights of parents and guardians to challenge the IEP. See *Rowley*, *supra,* 458 U.S. at 205-07.

In actions brought under the IDEA, "the court -- (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The court is to apply a modified *de novo* standard of review. *S.H., supra,* 336 F.3d at 270. In reviewing the decision of a state agency under the IDEA, the district court must make its own findings by a preponderance of the evidence. *Shore Regional High School Bd. of Educ. V. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004). However, in order to prevent district courts from imposing their own views of preferable educational methods on the states, the court must give "due weight" to the administrative proceedings. *Rowley, supra,* 458 U.S. at 205-06. "Under this standard, '[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and '[i]f a reviewing court fails to adhere to them, it is obliged to explain why.'" *Shore Regional, supra,* 381 F.3d at 199 (quoting *S.H., supra,*

7

336 F.3d at 271).  The court must accept credibility
determinations made by the state agency unless the non-
testimonial, extrinsic evidence in the record would
justify a contrary conclusion. *Id.*  "In this context the
word "justify" demands essentially the same standard of
review given to a trial court's findings of fact by a
federal appellate court." *Id.*  An appellate court reviews
the district court's factual findings for clear error.
*Id.*  A finding of fact is clearly erroneous when, after
reviewing the evidence, the court is left with a definite
and firm conviction that a mistake has been committed.
*Id.*

"IDEA's grant of equitable authority empowers a court
'to order school authorities to reimburse parents for
their expenditures on private special education for a
child if the court ultimately determines that such
placement, rather than a proposed IEP, is proper under
the Act.'" *Florence County School Dist. v. Carter*, 510
U.S. 7, 12 (1993)(quoting *School Comm. of Burlington v.
Department of Educ. of Mass.*, 471 U.S. 359, 369 (1985)).
However, parents who unilaterally change their child's
placement without the consent of the school district do
so at their own financial risk. *Id.* at 15.  "They are
entitled to reimbursement *only* if a federal court
concludes both that the public placement violated IDEA
and that the private school placement was proper under
the Act." *Id.*

"A private placement is 'proper' if it (1) is 'appropriate,' i.e., it provides 'significant learning' and confers 'meaningful benefit,' and (2) is provided in the least restrictive educational environment." *Lauren W. Ex Rel. Jean W. V. Deflaminis*, 480 F.3d 259, 276 (3d Cir. 2007)(quoting *Ridgewood, supra,* 172 F.3d at 248). However, the private school need not meet all the requirements of a FAPE under § 1401(8). *Carter, supra,* 510 U.S. at 13.  As to the least restrictive environment requirement, "when the public school fails to provide an appropriate IEP, tuition reimbursement may be made to students placed in private schools that specialize in educating students with learning disabilities." *Warren G. v. Cumberland County School Dist.,* 190 F.3d 80, 84 (3d Cir. 1999). "The least-restrictive environment requirement does not bar reimbursement because 'the IDEA requires that disabled students be educated in the least restrictive *appropriate* educational environment.'" *Id.* (quoting *Ridgewood, supra,* 172 F.3d at 249). "An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement." *Id.*  "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." *Id.*

Finally, equitable considerations are relevant in determining whether to award tuition reimbursement.

*Carter, supra,* 510 U.S. at 16. "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Id.*

The burden of proof is on the party seeking relief. *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 391 - 392 (3d Cir. 2006).

IV.  Undisputed Facts.

The following facts are not in dispute.

Plaintiffs A.Y. and D.Y are the parents and natural guardians of B.Y. *Defendant's Statement of Uncontested Facts Pursuant to Local Rule 56.1* at ¶1 and *Plaintiffs' Response to Defendant's Statement of Undisputed Facts Pursuant to L.R. 56.1* at ¶1. B.Y. was born on April 12, 1997. *Plaintiffs' Response to Defendant's Statement of Undisputed Facts Pursuant to L.R. 56.1* at ¶2.

B.Y. resides with his parents in an area served by the Cumberland Valley School District. *Plaintiffs' Statement of Undisputed Facts and Motion for Summary Judgment/Judgment on the Administrative Record* at ¶I and *Cumberland Valley School District's Response to*

10

*Plaintiffs' Statement of Undisputed Facts at ¶I.* He is
eligible for special education and related services due
to his diagnosis of an Autism Spectrum Disorder, Non-
Verbal Learning Disorder, Attention Deficit Hyperactivity
Disorder, Pervasive Developmental Disorder and speech and
language impairments. *Id.*

B.Y. began attending a full-time autistic support
program in the District in December 2003, midway through
his kindergarten year. *Id.* at ¶II.1. He initially did
well in the program until, in the spring of 2004, his
teacher was injured and needed to retire. *Id.* B.Y. did
not thrive emotionally or academically during the
remainder of his kindergarten year. *Id.* Nor did he
recover during the fall of the 2004/2005 school year,
when he was enrolled in the District as a first grader.
*Id.*

In November of 2004, B.Y.'s parents removed him from
the District and placed him at the Janus School, a
private school located in Mount Joy which provides
programs for students with learning disabilities. *Id.* at
¶II.2. The District paid for that placement. *Id.* B.Y.
completed the 2004/2005 school year at Janus. *Defendant's
Statement of Uncontested Facts Pursuant to Local Rule
56.1 at ¶8 and Plaintiffs' Response to Defendant's
Statement of Undisputed Facts Pursuant to L.R. 56.1* at
¶8.

11

Valerie Domoto, the tutor Janus assigned to work with B.Y., had thirty years experience working with children with autism, significant training in applied behavioral analysis, and ten years experience as a teacher and tutor at Janus. *Plaintiffs' Statement of Undisputed Facts and Motion for Summary Judgment/Judgment on the Administrative Record* at ¶II.4 and *Cumberland Valley School District's Response to Plaintiffs' Statement of Undisputed Facts* at ¶II.4.  About 95% of the Janus students Domoto had worked with in her years at Janus fell along the autism/pervasive developmental disorder spectrum or had attention deficit disorder. *Id.*  During the second half of the 2004/2005 school year and during the 2005/2006 school year, Valerie Domoto met with B.Y. at least once per day and sometimes several times per day, depending on need. *Id.* at ¶II.5.  Domoto's work with B.Y. focused on academic concepts - particularly letter recognition and number concepts - but also on his social skills and behavioral plan. *Id.*

The District conducted a re-evaluation of B.Y. in March of 2005 but did not offer him an IEP for the 2005/2006 school year. *Id.* at ¶II.6.  For the 2005/2006 school year, the District and B.Y.'s parents entered into a settlement agreement whereby the District agreed to pay B.Y.'s tuition and transportation costs for him to attend Janus. *Defendant's Statement of Uncontested Facts*

12

*Pursuant to Local Rule 56.1* at ¶11 and *Plaintiffs'
Response to Defendant's Statement of Undisputed Facts
Pursuant to L.R. 56.1* at ¶11.

During the 2005/2006 school year, B.Y. suffered a
full-blown persistent behavioral crisis, wherein he was
frequently oppositional, disengaged, strongly resistant
to instruction, manipulative and prone to tantrums.
*Plaintiffs' Statement of Undisputed Facts and Motion for
Summary Judgment/Judgment on the Administrative Record* at
¶II.7 and *Cumberland Valley School District's Response to
Plaintiffs' Statement of Undisputed Facts* at ¶II.7.  At
the extreme, B.Y. was not only mentally and emotionally
unavailable for instruction, but also physically
unavailable as well in that he would literally run from
his classroom or, barring that, make verbal threats,
swear, rip up paper and break pencils. *Id.*  In response,
Janus and B.Y.'s parents collaboratively augmented his 1-
2-3 Magic behavior system which was already in use. *Id.*
at ¶11.8.  They agreed that if B.Y. had not self-
corrected his unacceptable behavior by the time his
teacher counted to "3," Janus would call B.Y.'s parents
to come pick him up and keep him at home or in their
office for the remainder of the afternoon. *Id.*  They
would avoid all interaction with him and would require
him to work quietly and independently on his school work.
*Id.*

13

While this behavior plan was being implemented, Valerie Domoto tailored a letter and phonemic awareness instruction and rewards program for B.Y. which she based on his passion for dinosaurs. *Id.* at ¶II.9.  Using this method, B.Y. learned all the letters of the alphabet by the end of the 2005/2006 school year. *Id.*

The District issued a re-evaluation report and an IEP for B.Y. in May of 2006, wherein the District recommended that B.Y.'s academic placement be in the specifically designed District autism program. *Defendant's Statement of Uncontested Facts Pursuant to Local Rule 56.1* at ¶12 and *Plaintiffs' Response to Defendant's Statement of Undisputed Facts Pursuant to L.R. 56.1* at ¶12.  In preparation for the re-evaluation, District staff visited Janus to observe B.Y. and meet with Janus staff. *Id.* at ¶13.  Janus staff and B.Y.'s parents were interviewed and completed evaluative checklists. *Id.*  Reports on B.Y.'s performance at Janus and evaluations completed at Janus were received. *Id.*  Other reports in the possession of the District were also reviewed. *Id.*  The District sent B.Y.'s parents a Notice of Recommended Educational Placement to approve the District's IEP, developed as a result of the May 10, 2006 IEP Team meeting. *Id.* at ¶16.  The parents considered the District's IEP and proposed classroom placement and found them to be inadequate. *Id.* at ¶18.

B.Y.'s parents rejected the District's proposed program and IEP. *Plaintiffs' Statement of Undisputed Facts and Motion for Summary Judgment/Judgment on the Administrative Record* at ¶III.1 and *Cumberland Valley School District's Response to Plaintiffs' Statement of Undisputed Facts* at ¶III.1. They first requested mediation, then in September of 2006 they filed for a due process hearing seeking an order requiring the District to continue to pay for B.Y.'s tuition and transportation for B.Y. to attend the Janus School during the 2006/2007 school year. *Id.*

Four sessions of due process hearings began on October 30, 2006 and concluded on January 26, 2007. *Id.* at ¶III.2. By a decision dated February 16, 2007, the Hearing Officer concluded that the proposed program offered by the District was not appropriate for B.Y. *Doc. 13, Exhibit 8* at 12. The Hearing Officer also concluded that the program provided at the Janus School was not appropriate for B.Y. *Id.* at 13. The Hearing Officer ordered that the District is not required to pay for tuition and transportation for B.Y. to attend the Janus School during the 2006/2007 school year. *Id.* at 15. The Hearing Officer also ordered the District to provide compensatory education to B.Y. equivalent to the full costs of providing an appropriate program to B.Y. from the start of the 2006/2007 school year until the date on which an appropriate program is offered to B.Y. *Id.* The

15

Hearing Officer ordered the District to complete a reevaluation of B.Y., to prepare an new IEP for B.Y. and to offer a Notice of Recommended Educational Placement for B.Y. *Id.*

B.Y.'s parents and the District both filed exceptions to the Hearing Officer's decision. *Plaintiffs' Statement of Undisputed Facts and Motion for Summary Judgment/Judgment on the Administrative Record* at ¶III.3 and *Cumberland Valley School District's Response to Plaintiffs' Statement of Undisputed Facts* at ¶III.3. B.Y.'s parents contended that the Hearing Officer erred in failing to award reimbursement for their tuition and transportation costs incurred during the 2006/2007 school year. *Id.* The District contended that the Hearing Officer improperly awarded compensatory education since the parents had not requested that as a remedy. *Id.*

By an Order dated April 2, 2007, the Appeals Panel reversed the Hearing Officer's award of compensatory education, affirmed the Hearing Officer's Order denying tuition and transportation reimbursement, and ordered the District to complete an evaluation, IEP and Notice of Recommended Educational Placement for B.Y. *Id.*

16

V.   Additional Evidence.

         The plaintiffs have submitted evidence for the
court's consideration in addition to the administrative
record.  The plaintiffs have submitted the following
evidence in addition to the administrative record: 1) the
transcript of the deposition of Valerie Domoto (B.Y.'s
tutor at the Janus School); 2) a May 17, 2007 Final
Report from the Janus School regarding the 2006/2007
school year which was introduced during Valerie Domoto's
deposition; 3) the transcript of the deposition of
Beverly Wilson (the director of special education at the
Cumberland Valley School District); 4) an invitation
dated August 6, 2007 to the plaintiffs from the District
to participate in an IEP team meeting and a reevaluation
report on B.Y. dated August 7, 2007 from the District and
which was introduced during the deposition of Beverly
Wilson 5) the transcript of the deposition of A.Y.; and
6) a DVD (recorded on August 20, 2007) of B.Y. reading
and doing math problems at the Janus School.

     As stated above, in actions brought under the IDEA,
"the court -- (i) shall receive the records of the
administrative proceedings; (ii) shall hear additional
evidence at the request of a party; and (iii) basing its
decision on the preponderance of the evidence, shall
grant such relief as the court determines is
appropriate."  20 U.S.C. § 1415(i)(2)(C).

There is conflict among the Courts of Appeals about the meaning of 20 U.S.C. § 1415(i)(2)(C)'s requirement that district courts shall hear additional evidence at the request of a party.  In *Town of Burlington v. Dept. of Educ. for the Commonwealth of Mass.,* 736 F.2d 773, 790 (1st Cir. 1984), *aff'd on other grounds*, 471 U.S. 359 (1985), the Court of Appeals for the First Circuit construed the word "additional" to mean supplemental. The Court stated that the requirement that district courts shall hear additional evidence at the request of a party does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony. *Id.*  The Court stated:

> A trial court must make an independent ruling based on the preponderance of the evidence, but the Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial.  The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.  The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

*Id.*

Some other courts have adopted *Burlington's* construction of "additional evidence." *See e.g. Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th

Cir. 1993)(adopting *Burlington's* construction of
"additional evidence" but upholding admission of evidence
concerning relevant events occurring subsequent to the
administrative hearing); *Walker County School Dist. v.
Bennett*, 203 F.3d 1293, 1299 (11th Cir. 2000)(adopting
*Burlington's* construction of "additional evidence");
*Springer v. Fairfax County School Dist.,* 134 F.3d 659,
667 (4th Cir. 1998)(adopting *Burlington's* construction of
"additional evidence").  The Sixth Circuit, however, has
refused to adopt *Burlington's* construction of "additional
evidence." *Metropolitan Gov't of Nashville v. Cook*, 915
F.2d 232, 234 (6th Cir. 1990) ("Insofar as this language
[in *Burlington*] suggests that additional evidence is
admissible only in limited circumstances, such as to
supplement or fill in the gaps in the evidence previously
introduced, we decline to adopt the position taken by the
First Circuit.  "Additional," in its ordinary usage,
implies something that is added, or something that exists
by way of addition.  To "add" means to join or unite; the
limitation on what can be joined inherent in the term
"supplement" is not present in the term "add.").

    In *Susan N. v. Wilson School Dist.,* 70 F.3d 751, 758
(3d Cir. 1995), the Third Circuit held that the district
court in that case erred in concluding that it had the
discretion to summarily exclude altogether consideration
of additional evidence submitted by a party.  After
setting forth the First Circuit's construction of

19

"additional evidence" in *Burlington* and noting the Sixth

Circuit's disagreement with that construction, the Third

Circuit stated:

> Although we make no explicit interpretation of section 1415(e)(2)'s "additional evidence" clause, even under *Burlington*'s restrictive approach a district court first must evaluate a party's proffered evidence before deciding to exclude it.  Moreover, while the purpose of the *Burlington* construction is to "structurally assist[ ] in giving due weight to the administrative proceeding, as *Rowley* requires," *Burlington,* 736 F.2d at 790, the court of appeals did not say that a district court arbitrarily or summarily could exclude additional evidence submitted by a party in pursuit of that deference.  On the contrary, the examples that *Burlington* provided of additional evidence that should not be admitted were all types of evidence that courts might decide to exclude in a conventional civil proceeding.  For instance, the court stated that the additional evidence clause "does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony;  this would be entirely inconsistent with the usual meaning of 'additional.'" *Id*.  Even while making this statement, though, the court stressed that it would not be wise to devise a hard-and-fast rule:
>
>> We decline to adopt the rule urged by defendants that the appropriate construction is to disallow testimony from all who did, or could have, testified before the administrative hearing.  We believe that, although an appropriate limit in many cases, a rigid rule to this effect would unduly limit a court's discretion and constrict its ability to form the independent judgment Congress expressly directed. A salient effect of defendants' proposed rule would be to limit expert testimony to the administrative hearing. Our review of the cases involving the Act reveals that in many instances the district court found expert testimony helpful in illuminating the nature of the controversy and relied on it in its decisional process. There could be some valid reasons for not presenting some or all expert testimony before the state agency.
>
> *Id*. at 790-91.

20

Thus, the *Burlington* court stated that certain evidence may be excluded under IDEA judicial review out of deference to achieve administrative proceedings. The court, however, declined to devise a bright-line rule, choosing instead to leave "the question of the weight due the administrative findings of fact" to the discretion of the trial court. *Id.* at 791-92. Other courts, including ours, likewise have condoned the exclusion of additional evidence submitted by the parties to an IDEA proceeding when, for a particular reason, the court properly could exclude the evidence. *See, e.g., Bernardsville*, 42 F.3d at 161 (upholding exclusion of evidence as cumulative and improper embellishment of testimony previously given at administrative hearing).

It is regularly held that the question of what additional evidence to admit in an IDEA judicial review proceeding, as well as the question of the weight due the administrative findings of fact, should be left to the discretion of the trial court. *See,e.g., Carlisle*, 62 F.3d at 527; *Bernardsville*, 42 F.3d at 161; Oberti, 995 F.2d at 1219; *Burlington*, 736 F.2d at 791-92. As appellants note, Congress' central goal in enacting the IDEA was to ensure "that each child with disabilities has access to a program that is tailored to his or her changing needs and designed to achieve educational progress." Appellants' br. at 11. Children are not static beings; neither their academic progress nor their disabilities wait for the resolution of legal conflicts. While a district court appropriately may exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved. Consequently, on the remand the district court should use this standard in determining whether to admit the proffered additional evidence, i.e., would the evidence assist the court in ascertaining whether Congress' goal has been and is being reached for the child involved.

*Id.* at 759-760 (footnote omitted).

The defendant objects to the admission of the evidence (outside of the administrative record) submitted

21

by the plaintiffs on the grounds that such evidence is
not relevant to the issues in this case and/or is
cumulative of the evidence presented at the
administrative hearings.

The focus of the evidence (outside of the
administrative record) submitted by the plaintiffs
concern B.Y.'s progress at the Janus School during the
2006/2007 school year and after the administrative
hearings in this case ended.  Such evidence is
"additional evidence" within the meaning of 20 U.S.C.
§ 1415(i)(2)(C).

Since the evidence concerns events which occurred
after the District drafted its IEP, such evidence is
relevant to the question whether the IEP was appropriate
only to the extent that it sheds light on the
reasonableness of the district's initial decisions
regarding its particular IEP. *Susan N., supra.,* 70 F.3d
at 762.  In the instant case, the additional evidence
does not shed light on the reasonableness of the
District's IEP.  Thus, it will not be considered in
connection with the question wether the District's IEP
was appropriate.

However, the additional evidence submitted is
relevant to whether the Janus School was an appropriate
placement for the plaintiff during the 2006/2007 school

year.  The factfinder may find that it sheds light on
whether Janus' and the parents' prediction that the
behavioral improvement shown by B.Y. at the end of the
2005/2006 school year which made him available to learn
would continue into the 2006/2007 school year was
reasonable.

The defendant argues that the court should not admit
the additional evidence proffered by the plaintiffs in
connection with determining the issue of whether Janus
was appropriate because only evidence that was available
at the time the District made the determination that
Janus was not an appropriate placement for B.Y. is
relevant.  In support of that argument, the defendant
cites *Susan N., supra,* and *Furhman v. East Hanover Bd. of
Educ.,* 993 F.2d 1031 (3d Cir. 1993).  In *Susan N.,* the
Third Circuit reviewed the decision in *Furhman* and
cautioned against "Monday Morning Quarterbacking." 70
F.3d at 762.  It stated that "[t]he dangers inherent in
[the] process of second-guessing the decisions of a
school district with information to which it could not
possibly have had access at the time it made those
decisions are great," and that in determining whether or
not to admit such evidence the district court must
examine such evidence carefully. *Id.*  However, *Susan N.*
was addressing the issue of whether the program offered
by the school district met the requirements of the IDEA.
In the instant case, as indicated above, we have already

determined that the additional evidence proffered by the
plaintiffs is not admissible with respect to the question
whether the IEP offered by the District was appropriate
under the IDEA.  Since the District offered an IEP for
B.Y. which would have placed him in a program in the
District, it did not have to determine at the time it
offered the IEP whether Janus was an appropriate
placement.  The additional evidence is admissible with
respect to whether the parents' placement of B.Y. at
Janus was appropriate in that it may shed light on
whether Janus' and the parents' prediction that the
behavioral improvement shown by B.Y. at the end of the
2005/2006 school year which made him available to learn
would continue into the 2006/2007 school year was
reasonable.  It is for the finder of fact to determine
what weight such additional evidence deserves.

VI.  Discussion.

    The plaintiffs are seeking reimbursement for the
tuition and transportation costs they incurred for B.Y.
to attend the Janus School for the 2006/2007 school year.
As indicated above, they are entitled to reimbursement
only if the public placement offered by the District
violated IDEA and the Janus School placement was proper
under the Act.

A.  Was the District's IEP Appropriate?

The Hearing Officer found that the IEP offered by the defendant was not substantively appropriate under the IDEA.  The Hearing Officer reasoned and concluded as follows:

>       Turning to the substantive components of the ER [Evaluation Report] and IEP, I have limited my review of testimony and exhibits to testimony about events and materials produced prior to the May 10, 2006 reevaluation and IEP team meeting. Specifically, I have not considered exhibits J-24, J-25, J-26, J-27, or J-32 in my determination of the appropriateness of the ER and IEP because, having been produced after the IEP was developed, they were not available to the IEP team.
>
>       Because the reevaluation and ER are intended to inform the IEP team in its development of the IEP, I first looked at the ER.  Although with just a cursory review [of] the ER it may appear to be appropriate, it is lacking in several areas.  To its credit the District did attempt to collect the information necessary to complete the reevaluation. District staff reviewed records and reports it had, visited Janus, observed B.Y. at Janus, interviewed B.Y.'s parents and Janus staff, and had B.Y.'s parents and Janus staff complete evaluative checklists.  With all of that information, it is unfortunate that the ER does not appear to be individualized for B.Y. Specific sections of the ER are clearly boilerplate.  For example, in the academic recommendations sections it states:
> - Use of goal selection principles to develop individual program.
>   - Will the skill help the student in the current or future environment?
>   - Will the skill help the student access more reinforcement in natural settings?
>   - Is the skill age appropriate?
>   - Is the skill socially valid?
>   - Does the skill enhance special interests and talents of the student?

○ Will the skill assist the student in
becoming a productive contributor to
the community?

Not only is that a very generic listing of
principles that could guide goal development for
almost any child, it is taken verbatim from the
guiding principles contained in an interview
form used by Ms. Weaver when she interviewed
B.Y.'s parents and Janus staff.  Because it was
part of the form itself, not one of the answers
given by the interviewees, and because it is so
generic as to apply to almost any child, that
statement is not specific to B.Y. and should not
be part of his ER.

Later in the academic recommendations
section of the ER it recommends the use of ABA
(i.e. Applied Behavior Analysis).  While ABA may
be appropriate for B.Y., in this context its
inclusion appears to be more boilerplate.  Later
in that same section it states "The use of the
principles of Applied Behavior Analysis."  What
appears to have happened is the individual or
individuals who actually wrote the ER kept
putting in things that they thought might be
good for any child with autism.  Another example
from the same section of the ER are the
suggestions that are part of the use of ABA that
task analysis and forward and backward chaining
be used.  Again, just a few lines later is the
recommendation that "The use of task analysis,
forward and backward chaining may be effective
strategies."

From the above examples, and the ER is
replete with these and other indicators of
boilerplate material, I must conclude that the
reevaluation and subsequent ER are not
appropriate because they are not individualized
for B.Y.  What is needed is a new reevaluation
for B.Y.

Because the reevaluation and ER provide the
foundation for the development of the IEP, it is
impossible for an IEP to be appropriate when the
reevaluation and ER are not appropriate.  In
this case the IEP is not appropriate, in part,
because it is replete with boilerplate,
incorporating much of the language of the ER
into the IEP, including the boilerplate
discussed above.

The IEP developed for B.Y. included seven
goals addressing reading and language skills,

math, handwriting, self-regulation, social
skills, conversation skills, and emotions.  Some
of those goals are unclear, another fails for
its lack of specificity, and another is
incomplete as presented in the IEP.

Goal four in the IEP, regarding self-
regulation, references the use of engine levels.
After listening to the witness[es] in four
hearing sessions and reading all 1004 pages of
transcript, I still have no idea what is meant
by the reference to engine levels in the IEP.
Similarly, goal seven in the IEP, regarding
emotional state, provides for the use of an
emotional thermometer and emotional toolbox.
There was little if any mention of either an
emotional thermometer or an emotional toolbox
during the present hearing and I still have no
idea what those terms are referring to.  More
importantly, it is not clear that either all the
members of the IEP team or the teachers who
would implement the IEP understand those terms.
Frankly, both the reference to engine levels and
the references to the emotional thermometer and
toolbox appear to be more boilerplate, put down
because they work with some autistic children.
They may, in fact, be appropriate for B.Y., but
is impossible to tell that from the ER and IEP
that have been produced by the District.

Goal one in the IEP, regarding reading and
language skills, provides no levels at which
those skills will be attempted.  Without
specific appropriate levels being included in
this goal, it is impossible for this goal to be
implemented.  It is also impossible to conclude
that it is appropriate.

The rubric referenced as being attached to
the IEP in goal five was not part of the IEP
when it was offered to B.Y.'s parents.  In
addition, the social skills short term
objectives for goal five in the IEP were not
part of the IEP when it was offered to B.Y.'s
parents.  Without a complete IEP B.Y.'s parents
could not have understood what was being
offered. With an incomplete IEP offered to the
parents, the IEP must be found to be
inappropriate.

Lastly, the district knew that B.Y. had
extensive behavioral, emotional, and academic
difficulties in prior placements in both the
District and at Janus.  The District also knew
that B.Y. required help with transitions.  In

fact, the District included the recommendations
of advanced preparation for transitions and
comprehensive planning for major transitions,
including transitions from school to school in
both the ER and IEP.  Knowing that transitions
were difficult for B.Y. and that transition
planning was necessary for him to successfully
return to the District from Janus, the only
mention of transition planning that the District
included in the IEP was a transition note that
stated the once B.Y.'s parents had visited the
autistic support classroom in the District and
"If [B.Y.'s parents] approve his placement a
transition plan will be developed. . ."  As
B.Y.'s parents' attorney noted, this is merely a
promise of a transition plan, not an actual
transition plan.  I must agree.  When a school
district knows that a child requires a
transition plan to return to that district from
a private school placement and that school
district does not include a transition plan in
the IEP, the IEP is not appropriate. *In Re the
Educational Assignment of S.K.,* Spec. Educ. Op.
1769 (2006).

Considering all of the above, it is my
conclusion that the IEP developed on May 10,
2006 and offered to B.Y.'s parents was not
appropriate.

In conclusion, neither the reevaluation,
the ER, nor the subsequent IEP were appropriate.
Because of that, I must conclude that the
program proposed by the District and offered to
B.Y.'s parents was not appropriate.

Doc. 13. Exhibit 8 at 10-12(citations to exhibits and

findings of fact omitted).


The Appeals Panel affirmed the Hearing Officer's

determination that the IEP was substantively inadequate.

*Doc. 13, Exhibit 2* at 6.[1]

---

[1] The Appeals Panel also determined that the District
violated the procedural requirements of the IDEA in preparing
the IEP. *Doc. 13, Exhibit 2* at 6.

After reviewing the entire administrative record, we conclude that a reasonable trier of fact, giving "due weight" to the administrative proceedings and taking the hearing officer's factual findings as prima facie correct, could not find by a preponderance of the evidence that the District's IEP was appropriate under the IDEA.

B.   Was the Janus School Appropriate?

The Hearing Officer concluded that Janus was not an appropriate placement for B.Y.  The Hearing Officer reasoned and concluded as follows:

> In discussing the IEP I limited myself to consideration of evidence produced prior to the development of the IEP.  Similarly, in considering the appropriateness of the Janus program, I have limited that consideration mostly to items produced prior to B.Y.'s parents filing for the present hearing and have excluded any consideration of the current school year. The one exception is the IEE completed by Dr. Kay. I have given great consideration to the IEE for the following reasons: 1) it is an IEE completed by a psychologist of the parent's choosing, 2) it was completed by someone who has evaluated B.Y. three other times, 3) it was completed within about two weeks of the filing for the present hearing, and 4) the evaluator is extremely familiar with Janus and its program.
>
> Janus is a private school that has a primary mission of providing programs to students with learning disabilities.  Although Janus does have some students with other disabilities, including autism and Asperger syndrome, B.Y. has not done well there.  Near the end of the 2005-2006 school year B.Y. showed some improvement and learning, but his difficulties in both areas continued.  Comparing across the time that B.Y. has been at Janus he

has made minimal progress at best and has shown a decline in several areas.

While Janus is appropriate for many children, it is not appropriate for B.Y.  B.Y. requires better use of direct instruction, more academic engagement with special education educators, and more effective and intensive interventions than Janus can provide.  He requires a full-time emotional support class, not a program pieced together in a school primarily providing for learning disabled students.  B.Y. also requires a program that will afford him the opportunity to interact with typically developing peers.  Something Janus cannot provide because all of its students have some identified disability.

Considering all of the above, it is my conclusion that Janus has not and cannot provide an appropriate program for B.Y. and must be found to be inappropriate.

*Doc. 13, Exhibit 8* at 10-12(citations to findings of fact omitted).

The Appeals Panel affirmed the hearing officer's determination that the Janus School was not an appropriate placement for B.Y. for the 2006/2007 school year. *Doc. 13, Exhibit 2* at 7.

After reviewing the entire administrative record and the additional evidence submitted by the plaintiffs, we conclude that a reasonable trier of fact, giving "due weight" to the administrative proceedings and taking the hearing officer's factual findings as prima facie correct, could find by a preponderance of the evidence that the Janus School was not an appropriate placement for B.Y for the 2006/2007 school year.  However, that is

not the only finding that a reasonable trier of fact
could make regarding whether Janus was an appropriate
placement.  Given the significant evidence in the
administrative record that by the end of the 2005/2006
school year B.Y. was no longer exhibiting the severe
behavioral problems that he had exhibited throughout most
of that school year and which impeded his learning, the
evidence that he was beginning to learn and the evidence
that his scores on standardized tests do not reflect his
actual ability, a trier of fact could reasonably
conclude, despite taking the hearing officer's factual
findings as prima facie correct, that for the 2006/2007
school year Janus was an appropriate placement for B.Y.
in that it was likely that B.Y. would make meaningful
academic progress there given the change in his behavior
and learning at the end of the 2005/2006 school year.
The additional evidence submitted by the plaintiffs
indicating that B.Y. did in fact make meaningful academic
progress at Janus during the 2006/2007 school year could
be construed by the factfinder to bolster such a
conclusion.

   Whether Janus was or was not an appropriate placement
for B.Y. for the 2006/2007 school year will require the
factfinder to weigh the evidence in the administrative
record and the additional evidence submitted by the
plaintiffs.  Such weighing can not be done in the summary
judgment context.  There is a genuine factual dispute

about whether Janus was an appropriate placement for B.Y. during the 2006/2007 school year.  Such a dispute is material to the plaintiffs' claim for reimbursement for tuition and transportation to the Janus School for the 2006/2007 school year.  Accordingly, summary judgment can not be granted. *See Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 (6th Cir. 1998)(stating that summary judgment is not appropriate in IDEA case if reexamination of the evidence reveals a genuine issue of material fact or if the parties wish to present additional evidence and genuine issue of material fact remains).

The plaintiffs moved not only for summary judgment but for judgment on the administrative record together with limited new evidence.  The defendant moved for summary judgment and judgment on the administrative proceedings.  As indicated above, we will admit the additional evidence submitted by the plaintiffs.  Thus, we can not decide the case on the administrative record and the case will proceed to trial.  However, we note that, if the parties agree, the case could be decided on the administrative record and the additional evidence already submitted without the need for the court to take live testimony. *See Acuff-Rose Music, Inc. v. Jostens, Inc.,* 155 F.3d 140, 142-43 (2nd Cir. 1998)("a district court may decide a case by summary bench trial upon stipulation of the parties as long as the parties have

willingly forgone their right to a full trial"). If the parties so agree, they should inform the court in writing of that agreement.

V.  Order.

**IT IS ORDERED** that the motions (docs. 25 & 28) for summary judgment/judgment on the administrative record are **DENIED**.

                                        /s/ J. Andrew Smyser
                                        J. Andrew Smyser
                                        Magistrate Judge

Dated: July 7, 2008.